IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES COLLINS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 11-AR-0058-S |
| | } | |
| SUPREME BEVERAGE COMPANY, | } | |
| INC., | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

Before the court is the motion of defendant, Supreme Beverage Company, Inc., ("SBC"), for summary judgment.  It seeks dismissal of the above-entitled action brought by plaintiff, James Collins ("Collins").  Doc. 19.  Collins, who is black, sued SBC, his former employer, for race discrimination in violation of 42 U.S.C. § 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), retaliation in violation of Title VII, and disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA").  He appended the state law claims of outrage, negligent hiring, negligent supervision, and negligent retention.  Because Collins has withdrawn his ADA claim and his state law claims, these claims and the evidentiary materials that may bear only upon them will not be discussed.

For the reasons that follow, SBC's motion for summary judgment will be granted as to the retaliation claim, but denied as to the

race discrimination claim.

### Pertinent Facts from Collins's Perspective Surrounding Collins's Termination[1]

SBC, located in Birmingham, Alabama, is a wholesale beverage distributor that sells beverages, primarily beer and Red Bull, to restaurants and retail outlets.  SBC first hired Collins on February 2, 1998.  Collins worked in various positions, including driver, supervisor, salesman, and Assistant Warehouse Manager.  On October 28, 2005, Collins left voluntarily to work for a competitor.  Collins went back to work for SBC on April 5, 2006, after Mike Windham ("Windham"), a white male, who was Operations Manager of SBC's Birmingham warehouse, and who is a central character in this drama, called him and asked him to come back to SBC.  It appears, therefore, that SBC considered Collins qualified for the job of Assistant Warehouse Manager.  His title was later changed to Delivery Manager.  In both roles, he performed the same duties, which were to manage the drivers and delivery trucks at the Birmingham warehouse, including route assignments, providing helpers when needed, and reviewing each driver's count of product prior to departure in order to ensure that product counts were in

---

[1] Because of the procedural posture, all admissible evidence, and reasonable inferences, are viewed in the light most favorable to Collins.  Evidence submitted by SBC that contradicts evidence relied upon by Collins cannot be weighed in the balance, or even considered, unless it is admitted by Collins.  In other words, Collins does not have to convince the court of the truth of any of his evidence, but only that, if believed by a jury, it would entitle him to relief.

agreement with customers' orders.  Initially, Collins assigned the helpers to assist the drivers, but after a few months Windham took over this function.  No complaint about Collins's performance was voiced at the time.  At all times relevant, Windham, as Operations Manager, was in charge of the Birmingham warehouse and was Collins's immediate supervisor.  At all times relevant, James Hall ("Hall"), who is white, was SBC's Chief Financial Officer, and was the supervisor of both Windham and Collins.

In March 2007, Collins complained to Windham that black drivers were being assigned heavier loads than white drivers were, and that black drivers were not being assigned helpers like white drivers were.  For example, on a particular occasion Collins told Windham that James Thornton ("Thornton"), a white driver, should have taken some of the load of Allen Trainer ("Trainer"), a black driver.  He also complained to Windham that two other white drivers, Jason Poer ("Poer") and Chris Phelps ("Phelps"), had lighter loads than black drivers.  Windham thereupon asked Collins if he was "playing the race card."  Collins depo. at 99.  Collins replied, "No.  I mean, fair is fair.  You know, you should be treating everybody fair."  *Id.*  Collins says that Windham "got pissed off" at this.  *Id.*  During the same conversation, Windham also said to Collins: "You guys need to get your s[hit] together."  *Id.* at 100-101.  Most of the employees in the warehouse and on the delivery team were black.

During 2006 and 2007, the inventory counts of Red Bull were showing a significant shrinkage. Because of the portable nature of Red Bull and the ability of thieves to sell it without accounting for its sale to SBC, the company put in place extra precautions to prevent this shrinkage. These measures were not issued in writing. Neither was the discipline for a particular violation. One of SBC's oral instructions was to confine the Red Bull to a specified area of the warehouse. Everybody apparently was aware of this. SBC also required that the roll-down doors between the loading area and the warehouse remain closed at all times unless a manager was present to observe the "pulling" of Red Bull. Each driver had to compare his count of Red Bull to the manager's computer sheet showing the amount of Red Bull scheduled to be on a particular truck. If any additional items were added to a truck after the driver and manager compared their counts, the additional product had to be reflected on the driver's paperwork, and the manager had to oversee the loading of that additional product onto the designated truck. Hall says that he told Windham to communicate these new procedures to all of the warehouse employees and to make sure that they understood them. At deposition, Windham confirmed that he received this instruction from Hall, and he says he passed it on to all employees. Derrick Jones ("Jones"), a black driver, testified that he was never informed by any member of management of any issues about shrinkage or that any SBC policies were being

changed because of shrinkage.

After the new rules were announced, Hall began watching video from SBC's surveillance system each day looking for suspicious activity in the Red Bull area.

The testimony by Jones calls into question how thoroughly the new rules were explained to warehouse personnel.  There is no evidence that Collins, or any other employee, was told that any particular violation would call for the extreme discipline of termination.  Collins admitted that he was aware of the shrinkage problem and that he understood the requirement to keep Red Bull in certain closed-off areas.  Collins depo. at 91-92.  There is no evidence as to what procedures, if any, existed for an Assistant Warehouse Manager or a Delivery Manager to obtain permission to take a bathroom break while Red Bull was being "pulled" and loaded. Presumptively, drivers were supposed to know that they could not "pull" or load Red Bull outside the presence of an Assistant Warehouse Manager, or a Delivery Manager like Collins, or some supervisory employee of higher rank.  The enforcement of SBC's unwritten rules was apparently left to the good judgment of supervisors.

Although he cannot remember who the drivers were, Windham says that twice in 2007 drivers told him that Collins was not checking load sheets to make sure they were correct.  Windham was not asked, and did not state, the race of the drivers who gave him this

information about Collins.  The drivers allegedly told Windham that Collins was giving out the load sheets to drivers and having them verify the product on their own trucks.  Windham says that he considered this a serious offense at the time because it violated company policies and could result in lost inventory.  The only corroboration of such an oral warning is an SBC "warning report", signed by Hall, offered as proof that Collins received the verbal warning on April 4, 2007.  The report says that Collins was verbally warned because he "did not check load sheets causing the inventory to be short."  The "warning report", does not contain Collins's signature.  Collins denies ever having received or even having seen the report.  Under the circumstances, Collins's denial of any oral warnings prior to his termination must be taken as true.  There is no evidence of any oral warnings to other employees on or about April 4, 2007.

Hall says that on September 26, 2007, he watched video surveillance from earlier that morning in the Birmingham warehouse, where he observed Joe Winborn ("Winborn"), a black forklift operator, open a roll-up door, enter a section of the warehouse, pull a partial pallet of Red Bull, load the Red Bull onto an empty pallet, load the pallet onto his forklift, and place the pallet of Red Bull on a delivery truck.  Although the video, which has been destroyed or lost, purportedly showed the entire length of the warehouse floor on the morning in question, Hall testified that he

did not see Collins or any other manager supervising the actions of Winborn.[2]  Hall says he found Winborn's activity suspicious because Winborn went into a prohibited area, pulled product, and loaded it on a truck that it was not supposed to go on, all unsupervised. Hall says he believed that Winborn's activity was in direct violation of the directives that had recently been issued.  At that time, Hall also believed, for some unexplained reason, that Winborn had placed the Red Bull on a truck driven by driver Kenneth Perry ("Perry"), who, like Winborn and Collins, is black.

At Hall's direction, Windham fired Winborn, Perry, and Collins on September 28, 2007.  The reason given by Windham was "violation of policies/procedures."   According to Collins, Windham told him that he was being fired because he had let Winborn put ten cases of Red Bull on Perry's truck when Perry had no order for Red Bull. Collins's version of the conversation must be taken as true.

After being terminated, Collins telephoned Mike Schilleci ("Schilleci"), SBC's Vice President.  Schilleci, who is white and who is over both Windham and Hall in the SBC chain of command, told Collins he had been terminated because "they said you let ten cases of Red Bull get by" and "I'm tired of all the stuff being missing." Collins depo. at 148.  Schilleci told Collins: "All of ya'll are fired."   *Id.*   This remark can fairly be interpreted as an

---

[2] The arguable significance of the fact that the video footage no longer exists is discussed *infra*.

7

accusation of collaborative theft by the three fired employees.

Later, the day of the firings, it was somehow determined that the truck onto which Winborn had loaded the Red Bull was not, in fact, Perry's truck.   Thereupon, at Hall's direction, Windham contacted Perry and re-hired him, overlooking or forgiving any possible violation by him of the policies and procedures applicable to drivers.   There is no evidence that an investigation was conducted into whose truck, if any, Winborn placed the Red Bull in, if any.   How Hall arrived at his erroneous belief that it was Perry's truck is not reflected in the record.

**Other Evidence in Support of Collins's Story**

Collins says that Windham used racial slurs when referring to black employees.  Collins testified that Windham would say: "You people", or "Ya'll people", when speaking to blacks  Collins depo. at 108-109.  Collins also testified that Windham once said to a group of black drivers: **"You mother-fuckers need to do this.  I'm sick of your shit, I'm going to fire all your asses."**  Collins depo. at 103-04.  When Collins heard Windham talk to the drivers in this way he told Windham, **"You can't do this to grown guys."**  *Id.* Windham denies making any racial slurs or racial comments.  Windham depo. at 289-90.  What Windham said or did not say is a question of material disputed fact for a jury.

Collins also says that SBC took black drivers off their routes and replaced them with white drivers, and that black drivers were

8

given routes in predominately black areas of Birmingham. Specifically, Collins says that the routes of two black drivers, Trainer and Frederick Gaines ("Gaines"), were given to white drivers, Poer and Thornton. Windham explained to Collins that he moved Thornton to the route covered by Gaines because a bigger truck was needed and that Thornton had a Class A commercial driver's license while Gaines did not. Similarly, Windham told Collins that he moved Poer to the route covered by Trainer for the same reason, namely, that Poer had a Class A commercial driver's license and Trainer did not. Even though Windham denies any racial motivation for making these assignments, he does admit that Collins complained that assignments had been based on race.

Collins also says that he detected a pattern of black employees being fired and replaced with whites. According to Collins, the ratio of black to white employees "significantly" changed in favor of whites. However, Collins admits that during the entire time he worked at SBC, the majority of its warehouse and delivery employees were black. During 2007, although some whites and Hispanics worked in the warehouse, a substantial majority of drivers and workers (31 out of 43, or 72%) at SBC's Birmingham warehouse were black. On April 5, 2006, the date Collins began his second term of employment at SBC, at least 32 out of 45 employees working in SBC's Birmingham warehouse were black (71%), and on September 28, 2007, the date Collins was fired, at least 41 out of

48 employees working in the Birmingham warehouse were black (85%).[3]

Collins says that two white managers, Shea Hankey ("Hankey") and Ben,[4] had jobs that were "a little bit underneath mine, I think," but received raises when he did not, that they were assigned company vehicles when he was not, and that they were assigned company e-mail addresses when he was not. Collins depo. at 86. It is undisputed that Hankey and Ben were Red Bull supervisors who oversaw the Red Bull salesmen responsible for marketing, sales, and delivery of Red Bull. Neither Hankey nor Ben reported to supervisors to whom Collins reported. Collins depo. at 87-88. How Collins obtained information about Hankey's and Ben's compensation does not appear. It would probably be hearsay.

Collins also says that black drivers were denied helpers while white drivers were provided helpers. Helpers were usually warehouse workers. They were assigned as needed by Windham. Jones, the black driver, testified that on more than one occasion he asked for a helper for unloading product, but was always denied a helper.

**Procedural History**

After discovery was complete, SBC filed its present motion for

---

[3] Collins argues that SBC has not produced evidence to support these statistics. This assertion is incorrect. The statistics may be challenged for their accuracy, but not for their existence. The percentage of black employees may be consequential at trial, but not for a Rule 56 ruling.

[4] Collins never provides Ben's full name.

summary judgment, Doc. 19.  Collins responded, Doc. 36, after which SBC replied, Doc. 44.  On the same day on which SBC filed its reply brief, it filed a separate motion to deem as admitted certain of its alleged facts submitted in support of its motion for summary judgment, Doc. 39, and an entirely separate motion to strike, Doc. 41.  Collins filed responses to both of SBC's motions, Doc. 47, and Doc. 48.  The court denied SBC's motion to deem facts admitted and its motion to strike.  *See* text order entered June 22, 2012.  SBC then filed a motion to reconsider, Doc. 49, which the court denied, while informing the parties that the court would re-think any issues raised in SBC's motions if the evidence SBC objected to, or is allegedly admitted by Collins, were deemed necessary for deciding SBC's motion for summary judgment.  *See* Doc. 50.  The court now finds that Collins has not admitted any facts asserted by SBC that would change this court's decision.

**Race Discrimination Claim**

Both Title VII and § 1981 preclude employers from taking any adverse employment action on account of an individual's race.  *Maynard v. Bd. of Regents,* 342 F.3d 1281, 1288 (11th Cir. 2003).  Title VII and § 1981 race discrimination claims are subject to the same analytical framework.  *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Collins can pass the *prima facie* threshold either by presenting **"direct evidence"** of racial animus, or by presenting

11

"**circumstantial evidence**" of racial animus.  "Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption." *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (internal quotations and citation omitted).  On the other hand, evidence that only arguably suggests a discriminatory motive, is, by definition, circumstantial evidence.  It requires an application of inference or deduction.  It is not self-evident of animus.  *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1393-94 (11th Cir. 1997).

Collins contends that in this case there is direct evidence of racial discrimination.  Doc. 55.  The evidence he refers to, if it does not constitute direct evidence, certainly constitutes circumstantial evidence of racial animus.  The distinction between these two kinds of evidence is not always easy to make, but it is important.  The jurisprudence on this issue fails to draw a clearly discernable line between the two, leaving an element of judgment or discretion with the trial court.  The reason why the line must be drawn is if a plaintiff relies on direct evidence, and the trial court agrees that direct evidence exists, the employer's mere articulation of a legitimate non-discriminatory reason for its adverse employment action is not a defense that then calls for proof by the employee that the employer's given reason is pre-textual.  If there **is** direct evidence, the employer has the burden

12

of proving that its adverse action would have been the same, even if some animus did, in fact, exist.  In *Wall v. Trust Co. of Georgia*, 946 F.2d 805 at 809 (11th Cir. 1991), the Eleventh Circuit held:

> When plaintiff establishes her *prima facie* case by direct evidence of intent to discriminate on account of race, defendant's burden to rebut that evidence is to prove by a preponderance of the evidence that it would have made the same employment decision in the absence of discriminatory motivation.  (case citations omitted).

> Collins testified at deposition as follows:

> A.   "[Windham] **had a habit of talking really loud and verbally, well, explicit with the black drivers**. "You mother-fuckers need to do this. I'm sick of your shit.  **I'm going to fire all of your asses**." (Plaintiff, p. 103, ln. 5-10)

> **\* \* \***

> A.   He runs the warehouse.  (Plaintiff Dep., p. 103, ln. 17).

> Q.   And those kind of comments, where he was going to fire their "mother-fucking asses" and all that stuff, I mean was that—**Was he directing that specifically at the blacks**?

> A.   **Yes, sir.**

> Q.   **Did you ever hear him—Were whites in that vicinity at that time**?

> A.   **No sir.  Not at all.**

> Q.   **None of the white drivers**?

> A.   **No sir.**"

(emphasis added).

Windham, the alleged loud-mouth who was "pissed off" when Collins

said to him "fair is fair", was one of the decision-makers in the firing of Collins. He was the supervisor who actually communicated the bad news to Collins. Two other black employees were fired at the same time, as part of the same incident. Neither Hall nor Windham asked Collins for an explanation of his alleged misconduct before the ax fell. Although Windham never used the "N" word while in the presence of any of Collins's witnesses, there was no cerebration required by Collins, and none required by this court, to discern that Windham was threatening to fire black employees because of their perceived shortcomings as a racial group. Whether what Windham said was, as a matter of fact, or as a matter of law, "direct evidence" of racial motivation for the subsequent termination is a close call. The court makes the call in favor of Collins. Windham admittedly did not say, "I am going to fire your **black** assess". Instead, he used a well-understood pejorative term while speaking harshly to a group made up exclusively of black employees. The court finds that Windham's use of the term, "you people", when speaking judgmentally only to black employees, cannot be reconciled, unless by jury deliberation, with a federal statute requiring that all employees, black and white, be treated alike. The words "you people" necessarily meant "black" in the context they were uttered. There was no need for explanation or elaboration. Windham was as graphic and unsubtle as if he had used the "N" word. The Eleventh Circuit has held that making reference

14

to "you people" may, in certain circumstances, be direct evidence of racial animus.  *See E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 922 (11th Cir. 1990) (supervisor's statement to black employee that "you people can't do a ___ thing right" was direct evidence of discrimination).  An illustration of circumstances or context that removes all possibility of mis-comprehension of what is the intent of a speaker is a speech made to the N.A.A.C.P. in which the speaker said, "They're gonna put y'all back in chains."  Every N.A.A.C.P. listener, and the general public, immediately understood the racial connotation in this remark.  Collins and his friends understood what Windham was saying.

## Analysis

On the possibility that the court is wrong in finding the existence of direct evidence, the court will proceed first on SBC's hopeful courter-assumption that there is only circumstantial evidence of racial animus.

The analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies if the evidence of proscribed racial motivation is only circumstantial.  Employing this assumption, Collins would be required to demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position from which he was terminated; (3) he was terminated; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside

his protected class.  *Maynard*, 342 F.3d at 1289.

The first, second, and third elements of Collins's *prima facie* case under *McDonnell Douglas* are not disputed.  There is a sharp dispute, however, with regard to the fourth element, namely, whether Collins was replaced by a white employee.  SBC contends that Buster Tate ("Tate"), a black male, replaced Collins.  Collins initially testified that he did not know who replaced him.  Collins depo. at 328.  He now says that Tate merely filled in temporarily until a white male, Glen, was brought in to replace him.  A white driver, Thornton, testified: "It was – I can't even remember his name.  It was a white gentleman though.  He took over James Collins's job.  That's all I know."  Thornton depo. at 185.  Tate's deposition testimony is that he replaced Collins for a very short period of time, but that Glen was the permanent replacement.  Tate testified:

> Q. Who did James Collins' duties after James was terminated?
>
> A.  Well, we had night — well, I – I took over his duties.
>
> Q.  Did you do that – excuse me, permanently or was that for a time until they could hire somebody?
>
> A.  Just for a time till we got someone hired.
>
> Q.  And who got hired?
>                         . . .
>
> A.  I can't recall.  Well, I think Glen came up from Tuscaloosa then.

16

Tate depo. at 23-4, 33.

Whether SBC actually intended for Tate merely to "fill in" until Glen could replace Collins can only be determined by a weighing of the relative believability of the witnesses.  The court cannot make credibility determinations or indulge logical inferences at this stage.  Construing the facts in the light most favorable to Collins, the court finds that for Rule 56 purposes, Collins has made a sufficient showing of the fourth element, namely, that he was replaced by someone outside his protected class.  With all four elements supported by evidence, Collins has met his burden of establishing a *prima facie* case of race discrimination, even if the court is wrong in finding direct evidence of animus.[5]  Thus, examining Collins's claim under the *McDonnell Douglas* burden-shifting analysis, the burden shifts to SBC to rebut the *prima facie* case.  Defendant must articulate one or more legitimate, non-discriminatory reasons for its decision to terminate Collins.  *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).  Keeping in mind that the defendant's intermediate burden is "exceedingly light," *id.* (citing *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir. 1994)), the court finds that

---

[5] It is enough that Collins has met the fourth prong by showing that he was replaced by someone outside of his protected class, so the court need not address whether Collins has also met the fourth element by using the alternative method, i.e., that a similarly situated white employee was treated more favorably than he.

SBC has met its intermediate burden with evidence that would allow a rational factfinder to conclude that Collins's termination was not an act of racial discrimination, but rather was motivated by one or more of the legitimate reasons it has articulated.

When the employer, as in this case, has met its intermediate burden, any presumption of discrimination that may have arisen from plaintiff's *prima facie* case "simply drops out of the picture," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). Plaintiff is then required to demonstrate that the employer's articulated reasons are mere pretext, disguises for its real reasons. *Holifield,* 115 F.3d at 1565. The Eleventh Circuit has elaborated this concept as follows:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." The district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal citations and parentheticals omitted).

18

Collins argues that SBC's changing, conflicting, and false reasons given for firing him are enough to prove pretext. He points out that when he was fired no Red Bull had been loaded onto Perry's truck as SBC contended, and that this reason given him was facially false. He also points out that SBC has destroyed or lost the surveillance video from the day in question, and that Collins is entitled to the adverse inference that the video would benefit him by showing the falsity of Hall's testimony.

An employer's giving of inconsistent or "shifting" reasons for an adverse employment decision can be sufficient evidence of pretext. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004). The evidence here reflects that varying and arguably conflicting reasons have been given by SBC. Although legitimate reasons have been articulated, their consistency or their contradictory natures are matters for a jury. Windham filled out a "Termination Report" on the day Collins was fired, checking the box "Performance" and writing under the "Additional Comments": "James was dismissed for lack of institutional control – people were stealing right in front of him and he wasn't doing anything about it." Windham later testified that Collins, Perry, and Winborn were all terminated because "they loaded Red Bull on the wrong truck, on a truck that it wasn't scheduled to go on." Windham depo. at 91. Windham confirmed that when he told Collins and Winborn that they were fired, he told them

both "it was because of loading Red Bull onto Kenny Perry's truck." Windham depo. at 104-05. When Windham was later questioned specifically about the firing of Collins, he testified as follows:

> Q. **And was James Collins also accused of theft and terminated because of theft?**
>
> A. **He was** – he was – because he did not follow company policy about the way this was supposed to be done. And this wasn't the only reason that he was – he was not fired because of this Red Bull incident. This was the – the end of it. He had done that – done that on – not done that on several occasions, but he had – he had not followed company policies on several things.
>
> Q. You told me earlier he was fired because of this incident.
>
> A. Well, this was the – this was what got him fired.
>                    . . .
> Q. And as far as Mr. Collins goes, it's your understanding that the – he was terminated not just for the incident?
>
> MS. WILKINSON: Object to the form.
>
> A. There was – I understand there were others – yeah, other reasons.
>
> Q. And did that have to do with him following company policies –
>
> MS. WILKINSON: Object to the form.
>
> Q. Inventory control, stuff like that?
>
> A. Yeah. Absolutely. The way trucks were checked in and out.

Windham depo. at 131, 370-71. (emphasis added).

A jury will have before it not only the evidence proffered by

20

Collins, but will have substantial evidence from SBC upon which it may find that the decision-makers sincerely believed one or more of the various valid reasons that they have articulated.

Collins argues that the disappearance of the alleged surveillance video depicting Winborn loading the Red Bull outside the presence of Collins entitles him to the adverse inference that this footage would have been of forensic benefit to him. "A party has an obligation to retain relevant documents . . . where litigation is reasonably anticipated." *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1324 (S.D. Fla. 2010). Because SBC's articulated reason or reasons for firing Collins, if employed at trial, will require SBC to refer to the absent video tape, the possible significance of the tape and its absence need not be addressed at this point.

If the court is correct in its earlier finding that Collins has presented "direct evidence" of racial animus, Collins has no burden of proving pretext. Instead, SBC has the burden of proving that one or more of its various articulated reasons was its **only** reason for firing Collins. On the state of the evidence thus far, there is no absolute or incontrovertible proof that SBC's articulated reasons were its only reasons. The reasons are in dispute. The credibility of the witnesses is crucial to a determination of this issue.

21

**The Retaliation Claim**

In addition to his claim of racial discrimination, Collins contends that he was fired in retaliation for complaining to Windham that black drivers were being assigned heavier loads than white drivers and black drivers were not getting the same help as white drivers. "To establish a claim of retaliation under Title VII [], a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Goldsmith*, 513 F.3d at 1277 (citation omitted). "After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability." *Id.* "The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Id.* (citation omitted). The rubric is the same as that enunciated in *McDonnell Douglas*.

Was Collins's March 2007 complaint to Windham "protected activity" as Title VII defines that term? Title VII's retaliation provisions apply to employees who engage in one of two types of protected activity: 1) "opposition to" discrimination or 2) "participation in" a discrimination-related proceeding (for example, filing an EEOC charge of discrimination). 42 U.S.C. §

22

2000e-3(a).  Collins filed his EEOC charge after he was fired, rendering the participation clause inappropriate.  Under the opposition clause, an employee is protected from adverse action if he has "opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  A plaintiff engages in activity protected by the opposition clause when he opposes an employment practice that he has a good faith, reasonable basis to believe is unlawful.  *Butler v. Ala. Dep't of  Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008).  In order to satisfy this standard:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented.  It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).  (emphasis in original).  The opposition clause is viewed in the context of what can reasonably be expected in an ordinary business environment.  Accordingly, informal employee complaints in the workplace are given less protection than the participation clause gives something like an EEOC complaint.  *Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005).

SBC argues that Collins's expressed belief that SBC displayed racial animus and violated Title VII when it assigned black drivers

23

heavier loads and less help than white drivers was not **objectively** reasonable. Collins grousing probably was **subjectively** reasonable to Collins, but was it **objectively** reasonable? The Eleventh Circuit has held that "[t]he objective reasonableness of an employee's belief that his employer has engaged in unlawful employment practice must be measured against existing case law." *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1351 (11th Cir. 1999). Under existing Eleventh Circuit law, a plaintiff attempting to make out a *prima facie* case of retaliation must establish, among other things, that the complaint was of some **federally protected** adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802. SBC persuasively argues that an employer's allegedly assigning of heavier loads to black drivers than to white drivers does not rise to the level of an adverse employment action that results in a "serious and material change in the terms, conditions or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). SBC correctly points out that there is no evidence that the black drivers who allegedly did not get helpers, or who had heavier loads, suffered any decrease in salary or benefits. *See id.* at 1244 ("Courts . . . have been reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm."), citing *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (agreeing with "other circuits [which] have held that changes in assignments or

work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in work salary or work hour changes"). To the contrary, the Eleventh Circuit has held that "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis*, 245 F.3d at 1244.

Collins has not responded to SBC's argument that what Collins said to Windham, if it was intended to convey Collins's belief that SBC had engaged in unlawful racial discrimination, was not objectively reasonable. *See* Collins's opposition brief at 57 ("The only issue in the instant case is whether a causal connection existed.").   The absence of a rebuttal to SBC's argument may not be an "admission" by Collins, but by failing to respond to SBC's argument, Collins has conceded that he did not engage in protected activity and thus has no retaliation claim.   An argument not made can be deemed abandoned.   Even if Collins has not conceded the point, the court agrees with SBC that Collins's belief that SBC violated federal employment law when it assigned black drivers heavier loads and less help than white drivers was not an objectively reasonable belief as measured by existing case law. Changes in work assignments do not constitute adverse employment actions for purposes of making a *prima facie* case of discrimination by black drivers.   The drivers who were given heavier loads could

not have succeeded in a Title VII action if they had filed one. Put another way, Collins cannot mount a retaliation claim based on his having voiced, on behalf of others, a complaint that would have had no chance of success.   An employee's general complaint of unfair treatment does not translate into a charge of illegal discrimination protected by Title VII's anti-retaliation provisions.

Assuming *arguendo* that Collins did, in fact, engage in any activity protected by Title VII's opposition clauses, and that Collins has not waived the point, the causal relationship necessary for a *prima facie* case has not been demonstrated.   There is a six-month gap between Collins's complaints to Windham and Collins's termination.   There is nothing in the evidence that could lead a reasonable jury to conclude that between the six months separating Collins's conversation with Windham and Collins's termination, Windham and SBC had spent their time laying a trap for Collins and finally springing it.   The Eleventh Circuit has made it clear that "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."   *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).   *See also Henderson v. FedEx Express,* 442 F. App'x 502, 506 (11th Cir. 2011) ("[i]f there is a delay of more than three months between the two events, then the temporal

proximity is not close enough, and the plaintiff must offer some other evidence tending to show causation"). Collins has failed to do so. The mere existence of direct evidence of racial animus to prove another claim is no substitute for the causal connection necessary to prove retaliation.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment as to the retaliation claim will be granted, but will be denied as to defendant's race discrimination claim.

DONE this 12th day of October, 2012.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

27